ELDRIDGE, APPELLANT, *v.* FIRESTONE TIRE & RUBBER COMPANY, APPELLEE, ET AL.

(No. 84AP-861—Decided May 7, 1985.)

*Michael F. Colley Co., L.P.A.,* *Michael F. Colley, Dana A. Deshler, Jr.,* and *Michael R. Thomas,* for appellant.

*Crabbe, Brown, Jones, Potts & Schmidt, David J. Richards, William J. Burns, Jr.,* and *John J. Buchan,* for appellee.

MOYER, J. This matter is before us on plaintiff's appeal from a judgment on a directed verdict rendered by the Court of Common Pleas of Franklin County in favor of defendants.

Plaintiff, Eddie L. Eldridge, sued defendants for injuries he received when a push-type, rotary-power mower he was using backed over his left foot, resulting in the amputation of portions of several of his toes. Plaintiff was using a lawn mower of a friend who had purchased the mower from defendant, Firestone Tire & Rubber Co. He was pulling the mower backwards and tripped over a stump, thereby causing him to lose his balance and pull the mower over his left foot. The mower did not have a blade guard or any other guard on the back of the mower to prevent an injury such as the injury plaintiff suffered.

Plaintiff's suit for recovery was based upon a theory of strict liability in tort for the defective design of the lawn mower. Plaintiff conceded that defendant's mower met the industry standard in effect in 1968 when the mower was manufactured. Plaintiff's expert, Dr. Buchele, testified that in 1968 two types of guards were available to lawn mower manufacturers. They were the trailing guard and the blade guard. The trailing guard is a piece of steel or heavy plastic which is hinged at the rear of the lawn mower deck and is designed to prevent an operator's feet from coming in contact with the blade through the space created at the rear of the lawn mower between the deck and the ground. The blade guard is designed like a grill to fit over the blade and permits the grass, but not hands or feet, to come in contact with the blade.

Dr. Buchele also testified that in 1968 Toro Manufacturing had installed a trailing guard on its lawn mowers, and that in 1972 the industry standard was changed to require trailing guards on all lawn mowers. He also testified that, during the 1960s, there were approximately sixty thousand injuries per year resulting from contact with rotary mower blades and that such injuries are usually extraordinarily severe because of the damage inflicted by the blade upon skin, muscle, tissue, blood vessels, nerves and bones.

Dr. Buchele also testified regarding the availability to defendant of blade guards and trailing guards. He referred to exhibits indicating that patents had been issued for a number of such devices during the years preceding 1968; that placing blade or rear guards on lawn mowers was economically feasible; that the hazards of unguarded rotary-blade mowers, the severity of the injury they could inflict, and the technological feasibility of constructing mowers with guards were all known in 1968; that defendant's mower was a defective mower when it was manufactured; that

it was more dangerous than an ordinary consumer would expect; that it embodied excessive preventable dangers for which there were feasible alternatives; and that defendant's lawn mower was not a state-of-the-art machine in 1968.

Following presentation of plaintiff's case, the trial court entered a directed verdict in favor of defendant.

Plaintiff asserts the following two assignments of error in support of his appeal:

"I. It is reversible error for a trial court to weigh the credibility of an expert witness and grant a defendant's motion for directed verdict in a products liability design defect action, where plaintiff has established through such expert testimony that the likelihood and severity of product injury is high and that safer designs were mechanically and economically feasible.

"II. Evidence that a defendant seller's product was consistent in design with industry custom at the time of its manufacture does not establish that it is 'state of the art' and does not preclude its liability as a matter of law."

The assignments of error are interrelated and are considered together.

Civ. R. 50(A)(4) governs directed verdicts and provides:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

The determination to be made by a trial court when a motion for directed verdict ·has been made is not whether one version of the facts presented is more persuasive than another; rather, it is a determination that only one result could be reached under the theories of law presented in the complaint. When a motion for directed verdict is entered, it is the legal sufficiency of the evidence to take the case to the jury that is being tested. The trial court may not weigh the evidence or try the credibility of witnesses, but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. The "reasonable minds" test of Civ. R. 50(A)(4) requires the court only to determine whether there is any evidence of substantial probative value in support of the non-moving party's claim. A motion for a directed verdict raises a question of law because it examines the materiality of the evidence rather than the conclusions to be drawn from the evidence. See *Ruta* v. *Breckenridge-Remy Co.* (1982), 69 Ohio St. 2d 66 [23 O.O.3d 115].

We next consider whether the trial court properly considered defendant's motion for a directed verdict under the requirements of Civ. R. 50(A)(4). At the end of plaintiff's evidence and in response to arguments of counsel upon defendant's motion for directed verdict, the trial court made the following statement:

"My problem with the plaintiff's case is the professor's statement in answer to the question: Was this mower dangerously — dangerous or about the same as any other 1968 lawn mower? He says: 'About the same.'

"How many lawn mowers in 1968 had trailing guards? 'None.'

"How many lawn mowers in 1968 or today have whatever — that are push-type mowers — have guards? 'None.'

"By that standard, I cannot see where the defendant has fallen below the standard of the industry. If there was something unique that we could find, some trap, some defect, but there is no testimony of any trap or defect.

"It is a state-of-the-art machine from 1968.

"I think that is where we are. I will sustain the motion for directed verdict."

And, finally, the court observed that:

"* * * It is a standard ordinary old lawn mower. Every time any of us use one, there is a risk. That is where we are."

It is clear from the comments of the trial court that it not only misstated some of the evidence, but that it improperly applied Civ. R. 50(A)(4) in ruling upon defendant's motion for directed verdict. In *Knitz* v. *Minster Machine Co.* (1982), 69 Ohio St. 2d 460 [23 O.O.3d 403], the Supreme Court stated the law that should have been applied to the motion for directed verdict. The syllabus of *Knitz* provides as follows:

"A product design is in a defective condition if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner of if the benefits of the challenged design do not outweigh the risk inherent in such design. (*Leichtamer* v. *American Motors Corp.*, 67 Ohio St. 2d 456 [21 O.O.3d 285], approved and followed.)"

In its opinion, the court expanded upon the holding of the syllabus when it stated:

"* * * Factors relevant to the evaluation of the defectiveness of the product design are the likelihood that the product design will cause injury, the gravity of the danger posed, and the mechanical and economic feasibility of an improved design. * * *" (Citations omitted.) *Id.* at 466.

The court also indicated that the question of whether a product was defectively designed could be considered by a jury using hindsight; that is, a prod-

uct may be found defective in design even if it satisfies ordinary consumer expectations if the jury determines that the product's design embodies "excessive preventable danger." *Id.* at 465-466. The standard to be applied to a strict liability theory of recovery is different than the standard to be applied to a theory of recovery upon negligence. See *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 325 [4 O.O.3d 466], and *Knitz, supra,* at 463-464. It appears from the trial court's comments that the court applied the test for negligence rather than the test for strict liability in tort to the plaintiff's evidence. Defendant's arguments are also based primarily upon a negligence standard rather than the standard set forth in *Knitz.*

The issue is not whether the lawn mower in question was the state of the art,[1] or that the lawn mower was similar to most other lawn mowers built in 1968; the issue in a strict tort liability case for an alleged design defect in a consumer product is to be determined by the test stated in *Knitz, supra.* Specifically, in this case, the second part of the test should have been applied by the trial court. That is, if the design of the lawn mower embodied excessive preventable danger, or if a jury could find that the risk of danger inherent in the challenged design outweighs the benefits of such design, the jury could award damages to plaintiff.

Applying that test to the evidence presented by plaintiff and permitting all reasonable inferences in favor of plaintiff from said evidence, we conclude that the court erred when it sustained defendant's motion for a directed verdict. There was substantial testimony regarding the risk of danger inherent in a lawn mower that is designed to provide no protection to hands or feet when the

---

[1] The testimony of plaintiff's expert witness, Dr. Buchele, was in direct conflict to the conclusion of the trial court that the mower in question was the state of the art.

lawn mower is pulled backwards. The statistics offered by Dr. Buchele regarding the frequency of injury caused by rotary-blade mowers and the considerable testimony regarding the gravity of the danger posed and the mechanical and economic feasibility of an improved design could have formed the basis for a jury's determination that the mower in question embodied an excessive preventable danger. Indeed, Toro had already designed and sold lawn mowers in 1968 which embodied a rear trail guard. Because reasonable minds could have come to different conclusions upon the determinative issues when considering the evidence submitted by plaintiff, the trial court erred when it sustained defendant's motion for a directed verdict, and the assignments of error are therefore sustained.

For the foregoing reasons, the judgment of the trial court is reversed, and the cause is remanded to the trial court for further proceedings.

*Judgment reversed
and cause remanded.*

STRAUSBAUGH and NORRIS, JJ., concur.